UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6250-CR-FERGUSON



UNITED STATES OF AMERICA,

      Plaintiff,

      v.

KIMBERLY CRESPI,

      Defendant.

_____/

### DEFENDANT'S MOTION FOR DOWNWARD DEPARTURE

Defendant, Kimberly Crespi, through counsel, respectfully moves for a downward departure from the sentence range set forth in the Presentence Investigation Report (PSI), pursuant to Title 18 U.S.C. § 3553(b), U.S.S.G. §5K2.0, §5K2.19, and §5K2.20, and in support states:

**A.**    **Departures.**

Under Title 18 U.S.C. § 3553(b), a district court may depart from the applicable guideline range if "the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines that should result in a sentence different from that described." The Sentencing Guidelines elaborate on the appropriateness of sentencing departures:

> Circumstances that may warrant departure from the Guidelines pursuant to this provision cannot, by their very nature, be comprehensively listed and analyzed in advance. **The decision as to whether and to what extent the departure is warranted rests with the sentencing court on a case-specific basis.** Nonetheless, this subpart seeks to aid the court by identifying some of the factors that



the Commission has not been able to take into account fully in formulating the Guidelines. **Any case may involve factors in addition to those identified that have not been given adequate consideration by the Commission. Presence of any such factor may warrant departure from the Guidelines, under some circumstances, in the discretion of the sentencing court.** Similarly, the court may depart from the Guidelines, even though the reason for departure is taken into consideration in determining the guideline range (e.g., as a specific offense characteristic of other adjustment), if the court determines that, in light of unusual circumstances, the weight attached to that factor under the guidelines is inadequate . . ..

*   *   *

[A]n offender characteristic or other circumstance that is, in the Commission's view, "not ordinarily relevant" in determining whether a sentence should be outside the applicable guideline range may be relevant to this determination if such characteristic or circumstance is present to an unusual degree and distinguishes the case from the "heartland" cases covered by the Guidelines.

U.S.S.G. § 5K2.0 (emphasis added).

Thus, if it is going to depart from the Sentencing Guidelines, a district court must make two fundamental determinations: (1) what, if any, factor makes the case "atypical" (i.e., unlike the typical case found under the applicable sentencing guideline), and (2) should that factor result in a different sentence. United States v. Hoffer, 129 F.3d 1196 (11th Cir. 1997). "The first of these determinations is factual in nature, see Koon v. United States, 116 S. Ct. 2035 (1996), while the second involves both legal and factual considerations, see, Id. at 116 S. Ct. at 2047." Hoffer, 129 F.3d at 1196. A district court determines whether a case falls outside the "heartland" by making a refined assessment of the facts of the case, and comparing those facts to the facts of other cases falling within the guidelines' heartland. Id . (citing Koon, 116 S.Ct. at 2046-2047).

2

To determine whether a factor which takes a case outside the heartland should result in a different sentence, a district court must first decide whether the factor is forbidden, encouraged, discouraged, or unaddressed by the Guidelines as a potential basis for departure. Id. (citing Koon, 116 S.Ct. at 2046-2047). If a factor is discouraged, see, e.g., § 5H1.2 (education and vocational skills), or is an encouraged factor already taken into account by the applicable guideline, a district court may depart only if the factor is present to an exceptional degree or in some other way makes the case distinguishable from an ordinary case where the factor is present. Id.

Finally, a district court may depart on the basis of a factor not addressed by the Sentencing Commission if it finds, "after considering the 'structure and theory of both the relevant individual Guidelines and the Guidelines taken as a whole,'" that the factor takes the case out of the applicable guidelines' heartland. Koon, 116 S.Ct. at 2045 (quoting United States v. Rivera, 994 F.2d 942, 949 (1st Cir. 1993)). United States v. Ponder, 963 F.2d 1506, 1509-10 (11th Cir. 1992); United States v. Williams, 948 F.2d 706, 709 & n.3 (11th Cir. 1991).

**B.      Physical, Mental and Emotional Condition.**

The Sentencing Guidelines authorize a downward departure for certain offenses where the defendant suffered from a diminished or reduced capacity at the time of the offense. This departure normally reflects the extent to which the diminished capacity contributed to the commission of the offense. U.S.S.G. § 5K2.13. See United States v. Miller, 146 F.3d 1281 (11th Cir. 1998) (departure under U.S.S.G. § 5K2.13 may be justified "if the Defendant had a characteristic which took him out of the heartland of cases" and if "the diminished capacity [is] linked to the commission of the offense").

On the other hand, physical, mental and emotional conditions are "not ordinarily relevant" in determining whether a sentence should be outside the guideline range. U.S.S.G. §§ 5H1.3, 5H1.4. However, these conditions may be considered as grounds for departure where the physical impairment is "extraordinary," U.S.S.G. § 5H1.4, or where the condition exists to a kind or degree not adequately taken into account by the Commission. U.S.S.G. §§ 5H1.3, 5K2.0.

In this case, there is abundant evidence of mental health problems. There are three separate mental health evaluations in the Court file, the most recent conducted during Ms. Crespi's incarceration at the medical center in Fort Worth. But the link between Ms. Crespi's diminished capacity and the commission of the offense is tenuous. While it is likely that Ms. Crespi suffered some form of diminished capacity prior to the commission of the offense, by all accounts, Ms. Crespi's psychological problems became acute after her involvement in a serious automobile accident on March 14, 2001.

According to Dr. Walczak, who evaluated Ms. Crespi on three separate occasions, Ms. Crespi suffered "significant quantifiable brain damage" from this severe collision. Walczak Report at 6. (Exhibit A). This brain damage was exacerbated by overuse of prescription drugs during her rehabilitation. Her current prognosis is good, provided she receives ongoing treatment for depression, anxiety and substance abuse, including "outpatient psychiatric and mental health care." Shadduck Report at 12 (Exhibit B).

Based upon the detailed reports in the record, it appears that there exist mental and physical impairments to a sufficient degree to take this case outside the "heartland" of cases considered by the Sentencing Commission when formulating the Guidelines. This is therefore an appropriate

factor for departure and a lower sentence than that set forth in the Guidelines is warranted to reflect the Defendant's reduced mental capacity, and significant mental and physical impairment.

**C.     Extraordinary Rehabilitation.**

A separate ground for departure, somewhat related to the first, is Ms. Crespi's extraordinary post-offense rehabilitation effort, along with the significant improvement she has made with treatment and therapy.  The Sentencing Guidelines permit a sentencing judge to depart downward from the otherwise applicable sentencing range where the defendant has exhibited extraordinary post-offense rehabilitative efforts prior to sentencing.  In a recent amendment, codified as U.S.S.G. Section 5K2.19, the Commission issued a policy statement directing that such efforts, even if exceptional, are *not* an appropriate basis for a departure when re-sentencing the defendant for an offense (after appeal, for example).  By singling out defendants at re-sentencing, the Policy Statement implicitly approves of post offense rehabilitation as a ground for departure at a defendant's initial sentencing.

Indeed, the Commentary to the amendment makes the recognition of this ground for departure explicit:

> This amendment does not restrict departures based on extraordinary post-offense rehabilitative efforts *prior* to sentencing.  Such departures have been allowed by every circuit that has ruled on the matter post-<u>Koon</u>.  <u>See</u>, <u>e.g.</u>, <u>United States v. Brock</u>, 108 F.3d 31 (4th Cir. 1997).

U.S.S.G. App. C, Amendment 602 , comment. (backgd.) (emphasis added).

In this case, the Defendant's extraordinary rehabilitation and prognosis, as evidenced by the reports in the Court file, provide sufficient mitigating circumstances to warrant a downward departure. In May and November, 2001, Kim Crespi was "unable to show scores that reflect her age

5

and projected intelligence and daily functioning." Her condition was such that Dr. Walczak "seriously doubt[ed] that she [was] competent to stand trial." Walczak Report at 6 (Exhibit A). Now, according to the most recent report, she has "demonstrated an improvement in her overall cognitive functions, and these treatment gains are particularly noteworthy in the area of her memory functions." Shadduck Report at 12 (Exhibit B). Overall, "Ms. Crespi's prognosis is good," and, with the help of "ongoing outpatient psychiatric and mental health care . . . Ms. Crespi is unlikely to require a further period of hospital based mental health care." _Id._     These extraordinary efforts and significant progress   provide an additional basis for the Court to depart below the otherwise applicable guidelines.

**D.   Aberrant Behavior**.

Section 5K2.20 of the Sentencing Guidelines authorizes a sentencing court to depart below the applicable guideline range where the defendant's criminal conduct constituted "aberrant behavior." Because aberrant behavior is an "encouraged factor," as outlined by Koon v. United States, 518 U.S. 81 (1996), the sentencing court "is authorized to depart if the applicable Guideline does not already take [the factor] into account." Id. at 96. In recognition of the District Courts' "institutional advantage over appellate courts in making these sorts of determinations," the District Court's decision will be accorded great deference on appeal. Id. at 98, *quoted in* U.S.S.G. § 5K2.0, comment.

Section 5K2.20 sets forth certain criteria that must be met before a court may depart on this basis. Specifically, the guideline provides that a court may not depart on this basis if:

(1)     the offense involved serious bodily injury or death;

6

(2)     the defendant discharged a firearm or otherwise used a firearm or dangerous

weapon;

(3)     the instant offense of conviction is a serious drug trafficking offense;

(4)     the defendant has more than one criminal history point, as determined under

Chapter Four (Criminal History and Criminal Livelihood); or

(5)     the defendant has a prior federal, or state, felony conviction, regardless of

whether the conviction is countable under Chapter Four.

U.S.S.G. § 5K2.20.

None of these disqualifying factors applies to Ms. Crespi.   She has no criminal history

points, with only minor traffic arrests on her record.  The offense of conviction involved no violence

and no weapons.  And the offense, while a drug offense, is not a "serious drug trafficking offense"

within the meaning of this guideline, because Ms. Crespi qualifies for the safety valve, and there is

no mandatory minimum penalty.  U.S.S.G. § 5K2.20, comment. (n.1).

The Application Note goes on to define aberrant behavior as "a single criminal occurrence

or single criminal transaction that (A) was committed without significant planning; (B) was of

limited duration; and (C) represents a marked deviation by the defendant from an otherwise law-

abiding life." U.S.S.G. § 5K2.20, comment. (n.1).  The Application Note also directs the sentencing

court to consider the defendant's "mental and emotional conditions." U.S.S.G. § 5K2.20, comment.

(n.2).  Accord United States v. Withrow, 85 F.3d 527, 531 (11th Cir.), *cert. denied,* 519 U.S. 944

(1996) (departure available for first offender where crime is spontaneous and thoughtless act rather

than one which was the result of substantial planning).

This offense constitutes a single act of aberrant behavior. It was an act undertaken without significant planning, was of limited duration, and represents a deviation from an otherwise law abiding life. These factors authorize the Court to depart downward in this case.

**E. Family Responsibilities.**

Finally, while ordinarily not relevant, extraordinary family ties and responsibilities can form the basis of a departure if present to an unusual degree. U.S.S.G. §§ 5H1.5, 5K2.0. Kim Crespi's grandmother, Willa Mears, recently had a stroke. Ms. Crespi feels that it is important for her to be out of prison to be with her grandmother at this time. Also, Kim's 17 year old son Jimmy is suffering from his mother's incarceration. As reflected in the PSI, Jimmy is no longer attending school. According to Kim's mother, Cindy Mears, Jimmy "desperately misses his mother and is hopeful she will be released immediately." PSI at 10.

Wherefore, for the foregoing reasons, the Defendant Kimberly Crespi respectfully asks this Court to grant this Motion For Downward Departure and impose a sentence below the otherwise applicable guideline range.

Respectfully submitted,

KATHLEEN M. WILLIAMS
FEDERAL PUBLIC DEFENDER

By:    _____
Patrick M. Hunt
　Assistant
Federal Public Defender
Florida Bar No. 571962
Attorney for Defendant
1 E. Broward Blvd., Suite 1100
Fort Lauderdale, Florida 33301
(954) 356-7436 / (Fax) 356-7556

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the aforementioned motion was mailed on this ____ day of February, 2003, to Assistant United States Attorney Jeffrey Kay, 299 E. Broward Blvd., Fort Lauderdale, Florida 33301, and to USPO Donna Wilmot, 299 E. Broward Blvd., Fort Lauderdale, Florida 33301.

_____
Patrick M. Hunt

**EXHIBIT  "A"**

*MICHAEL F. WALCZAK, PSY.D.*
*DOCTOR OF PSYCHOLOGY*
*767 S. STATE ROAD 7, SUITE 18*
*MARGATE, FLORIDA 33068*
*PHONE: (954) 917-3600*
*FAX: (954) 917-3626*

## NEUROPSYCHOLOGICAL EVALUATION

**NAME:**      **KIMBERLY CRESPI**

**DATE(S) OF EVALUATION:**      **05/07/01, 05/10/01, 11/29/01**

**PLACE OF EVALUATION:**      **767S. STATE ROAD 7, SUITE 18**
     **MARGATE, FLORIDA 33068**

**DATE OF REPORT:**      **01/04/02**

**REASON FOR REFERRAL:**
To administer a neuropsychological evaluation to Kimberly Crespi with reference to bizarre behaviors and reports of memory loss. She also has a history of severe head trauma related to an automobile accident.

**GENERAL AND FAMILY HISTORY:**
Kimberly is 33 years old. At the time of this evaluation she was married to John. However since the May 2001 evaluation this relationship has changed. She has three children. Two teenage boys live with their birth father in Miami. A 16-year old son lives with Kimberly. The child's father, Kimberly's deceased ex-husband, was killed in an auto pedestrian accident in February of this year. This is mentioned because Kimberly and her son were in the car with him just before a car struck him. They did not witness the accident. However this event has had a profound effect on both parties for which neither of them has successfully addressed.

Kimberly was born in South Florida. She was evaluated on three occasions. The first evaluation was on 5/07/01, the second on 5/10/01 and the third evaluation on 11/30/01.

**EDUCATIONAL AND EMPLOYMENT HISTORY:**
Ms. Crespi has been on social security disability since 1995. She was injured as a waitress working for Denny's. She said she could not remember the details of

**NEUROPSYCHOLOGICAL EVALUATION**                          PAGE 2
**KIMBERLY CRESPI**                                        01/04/02

what happened that led to her accident. She walks with a noticeable limp and
appears to have the gait seen in individuals with foot drop. She did not graduate
high school and does not remember the grade she left school.

**MEDICAL AND PSYCHOLOGICAL HISTORY:**
On March 14, 2001 a vehicle she was driving was struck by another vehicle on
SR 441. Her car flipped and slid upside-down for 200 feet. She said she was
able to get out of the car. She said she was livid. However, she did realize she
was injured. She said she has been treated for a shoulder injury and various
muscle, joint and bone problems. There was no loss of consciousness. She did
have a seizure shortly after the accident. She was already taking medication
(Dilantin) for a seizure disorder. She had several cuts on her head from the
accident. One such cut was above her hairline. It appears to be 2 to 3 inches in
length. She does not know the number of stitches it took to close the wound.
She has since had a cervical MRI and brain MRI and an EEG.

Medical records dated 5-9-01 show an MRI of the brain with inflammatory
changes in the left nasal turbinates and ethmoidal air cells. This was a report by
Dr. Brown, neurologist.

On March 19, 2001 a pain evaluation and treatment recommendation evaluation
was performed at the Riverside Medical Association in Coral Springs. It was
noted that although she is right handed she showed a loss of strength on her
right hand compared to her left hand. It was also noted that she was positive for
a shoulder impingement. She was positive for posttraumatic headaches, right
eye ecchymosis with facial contusion and possible closed head injury.

During this evaluation she complained of memory loss. The doctor who signed
this report was Dr. Ruggiero.

Dr. Cary Hoffman performed an MRI of the right shoulder. This was done at
Park Place Orthopaedics and Rehabilitation. There is no evidence of discrete
partial or complete rotator cuff tendon tear. There is mention of inflammation.
This occurred on 4-1-01.

On 4-18-01 an MRI of the right shoulder at Damadian MRI was performed. The
findings were similar to the earlier findings of rotator cuff tendinopathy/tendonitis.
There was fluid build up along the bicep. Dr. David Saks signed this report.

On 5-2-01 Ms. Crespi received another MRI of the cervical neck region. The final
impression was a small left paracentral disk protrusion at c6/7, a disk bulge at
c5/6 and disk bulge and hypertrophy at c3/4. Dr. Gary Felsberg signed this
report.

Kimberly also complains of a disturbed sleep pattern. She sleeps for 3 to 4 hours
per night and she describes her sleep as fitful. She has sharp pains in her head

## NEUROPSYCHOLOGICAL EVALUATION
## KIMBERLY CRESPI

**PAGE** 3
**01/04/02**

but claims not to have headaches. Later she described these head pains as headaches. She was having marital problems before the accident and her relationship with her husband has been under additional stress. Her description of her husband varies from non-existent to someone who helps her through troubled times.

She does not recall the charge against her. She said, "When I try to remember I get anxiety, maybe I'm blocking it. Something with an airport. My brain is scrambled eggs. I can't remember." She showed deep depression when she said, "Why did God spare me? He took everything from me. I can't even go to the grocery store. He took my car, head, neck, shoulder and left side of my back."

### LEGAL AND SUBSTANCE ABUSE HISTORY:
Ms. Crespi's drug history shows she began smoking marijuana at age 13. She said she "smoked a lot". She added she "never really used coke". There is no heroin or other drugs that she admits to. However, there are prescription drugs that play a major role in her current condition. These include Serzone and Xanax. There may be other pain medications in her recent past that she either does not remember or has omitted in this evaluation.

During the November evaluation Kimberly stated information that suggested that she was using significant amounts of medication. She let slip that she receives medications to at least 2 doctors without knowledge of the other doctor. The medication is a duplication.

### MENTAL STATUS EXAMINATION:
Prior to the first evaluation Kimberly displayed a non-cooperative stance. Her voice bounced from calm to loud. It was later learned that this is a technique she employs to scare away people. She would become hysterical and show anger and frustration. Most of her emotion was frustration, as she could not remember the details of various events or times of her life. This frustration could be construed as angry or hostile. However, her behavior is the behavior frequently seen in individuals with recent head trauma. She is confused and easily frustrated and she strikes out without cause at her environment. During her last evaluation there appeared to be a motive to her anger.

It is not recommended to evaluate for neuropsychological damage until at least 6 months post head trauma. The last evaluation clearly falls under that category. The initial evaluations suggest brain damage. It is necessary to readminister these tests to see a pre-post test change.

### NEUROPSYCHOLOGICAL EVALUATION
### TESTS ADMINISTERED:
  Wechsler Adult Intelligence Scale III  (WAIS-III)
  Wechsler Memory Scale III  (WMS-III)

NEUROPSYCHOLOGICAL EVALUATION                                PAGE 4
KIMBERLY CRESPI                                               01/04/02

    Wisconsin Card Sort Test  (WCST)
    Osterrieth Complex Figure
    Boston Naming Test  (BNT)
    Right Left Orientation Test
    Continual Performance Test  (CPT)
    Trails A/B
    Test Of Memory Malingering  (TOMM)
    Review of Pretrial Service letter
    Review or Pretrial Service Report
    Review Of:
    NDNC MRI
    Riverside Medical Associates Initial Evaluation Report
    Park Place Orthpaedics and Rehabilitation MRI
    Damadian MRI

## NEUROPSYCHOLOGICAL ASSESSMENT

### INTELLECTUAL ASSESSMENT
### Wechsler Adult Intelligence Scale III (WAIS-III)
The WAIS-III revealed a full scale IQ of 66 with a performance IQ of 70 and a
verbal IQ of 67.  In reviewing her records she attained a GED and later an
Associates Degree in Pharmacology.  This differs from the information she gave
this psychologist as she stated she graduated high school but does not
remember the year and she made no mention of an additional degree.  If her
statement that she has an Associates Degree in Pharmacology is true then on
face value this IQ score is far below the expected findings.

All of her subtests scores are tightly clustered.  There is no subtest scatter of
significance.  This is suggestive of global loss of functioning as opposed to
someone who has a loss due to a specific blow to the head.  Her response
pattern does not suggest malingering.   The scores show attainment of easier
items with a quick drop off as the items become more difficult.  It is important to
note that her response pattern indicated much frustration exhibited by childish
display.  She would raise her voice at items she found confusing and would
challenge the examiner.  There is no Index Score below 1 percentile and none
above 2 percentile.

### MEMORY ASSESSMENT
### Wechsler Memory Scale III  (WMS-III)
Her WMSIII scores were tightly clustered as seen in the intelligence evaluation.
Since the individuals in this normed sample were taken from the IQ sample the
results should be the same.  They are in that they are tightly grouped but lower.
She has a limited percentile range from .1 to 1.  There are no areas of relative
strength.

NEUROPSYCHOLOGICAL EVALUATION                    PAGE 5
KIMBERLY CRESPI                                  01/04/02

Much of her memory problem is that she cannot attend. One cannot learn
something unless one can remember it and one cannot remember if one cannot
attend. At present Kim Crespi cannot attend to information present to her. Her
memory scores clearly indicate severe memory damage/loss. The type of
damage cannot fully be assessed until her brain naturally recovers from the head
trauma. There may be an overlay of drug usage involved and this must be
assessed and addressed. This combination usually takes 6 months to a full year.
It is to her advantage that these tests were administered now so that upon repeat
a more accurate picture of recovery can be assessed.

## GLOBAL ASSESSMENT
The Trails A/B was the only global assessment administered because of her
frustration level. Her resistance to testing was more than "I don't want to do it". It
was more of "I'm embarrassed with how I am doing".

Trails A/B measures a collage of skills. It measures visual scanning,
interpretation, motor skills, writing skills and more. Any one of these areas could
seriously skew the final timed result to indicate damage. The value of this test is
that it says if there is damage or not.

In Ms. Crespi's case damage is present and it is measured at a significant level.
Trails A converts to a T score of 16 and Trails B to a T score of 23. These are
based on the nationally recognized Heaton norms. These scores are age, sex
and education corrected. These scores are in line with her other findings and
again there is no evidence of malingering or symptom magnification.
Nonetheless her personality is flamboyant and boisterous and one might suspect
that she would over dramatize.

## LANGUAGE ASSESSMENT
### Boston Naming Test  (BNT)
The BNT has a standard score of 15 based on the Heaton norms and corrected
for age, sex and education. This score is seldom achieved by individuals in their
70s. This test score reflects an inability to find nouns identifying pictures of
simple line drawings. In some cases the individuals cannot visually perceive the
material. This did not seem the case with Kimberly. She could see the picture
and describe the picture. She could even define the function of the item in the
picture. She could not find the name for the picture.

The manner in which she responded is not suggestive of right frontal lobe
damage. A fragmented naming is often seen in the BNT to suggest right frontal
lobe damage. Her response pattern was more global and suggestive of an
inability to find the word in the memory lexicon. This type of response is positive
for brain damage with her circumstances. More importantly it also suggests the
possibility of drugs or alcohol along with mammillary body disease. (A loss of
memory based on long term storage structures)

**NEUROPSYCHOLOGICAL EVALUATION**                                 **PAGE 6**
**KIMBERLY CRESPI**                                               **01/04/02**

**MALINGERING ASSESSMENT**
**Test of Memory Malingering**
The TOMM is meant to reveal malingering or less than optimal effort. Kimberly
scored a 39 out of 50 on the first trial. This result was expected based on her
inability to attend and her inability to focus and concentrate. On repeat she
improved to a 45/50.

The improvement in the score from trial 1 to trial 2 is a good sign suggesting the
she was giving her best effort. That she earned 5 errors is less than optimum.
However based on her other test scores, the manner in which she responded
and her general confusion and quickness to lose control this score is acceptable
as a measure of best effort.

Kimberly's ability to suddenly change her tone when she perceives an advantage
in the conversation is very noticeable. In many ways this fits the Scarlet O'Hara
profile. However her overt manner or lack of transition does not allow her to
succeed at this endeavor. This gives more credibility to a primary brain injury
than to a primary personality disorder.

**VISUAL ASSESSMENT**
**Osterrieth Complex Figure Drawing**
The complex figure drawing was discontinued after the first attempt. She was
unable to copy the drawing, as she could not organize the design into meaningful
parts in her memory for copying. The design attempt showed a loss of visual
continuity. There is a discrepancy in her visual analyzer that may involve the
brain's motor strip.

**Right Left Orientation Test**
Kimberly earned a score of chance. She could not rotate a simple drawing in her
head to distinguish left from right. Her chance score probably indicates the
amount of information she gathers in any conversation.

**SUMMARY:**
There is significant quantifiable brain damage with Kim Crespi. She is unable to
show scores that reflect her age and projected intelligence and daily functioning.
Her medical records corroborate physical trauma and blunt trauma to the head.
Based on three meetings with Kimberly and several phone calls I seriously doubt
that she is competent to stand trial. However I did not administer a competency
evaluation.

There are several possibilities associated with the test findings on Kimberly
Crespi. One is that she is truly brain damaged and her care has not been
sufficient in scope or time to show a maximal recovery. Another possibility is that
her medication usage (both prescription and non prescription) may be hampering
her true cognitive abilities. The third possibility is that she is malingering. This

**NEUROPSYCHOLOGICAL EVALUATION**                                    **PAGE** 7
**KIMBERLY CRESPI**                                                  **01/04/02**

last option is highly unlikely based on test scores and sameness of behavior throughout all evaluations.

## RECOMMENDATIONS:

My clinical opinion is that Kimberly has a combination of the three possibilities listed above. I have noticed times when she can give solid information and just as quickly watch it disappear. I have information that her use of drugs is profound. She has answered the phone in a manner one hears from people high on drugs. I had the opportunity of hearing a phone call that she left on my recorder at work that showed the level of loss of control she can function at. I have information from others that her son is now driving her car at night without her knowledge and imitating her drug usage. This is highly suggestive of a major drug problem.

I know that she is scheduled for a drug evaluation and possible placement in the near future. It is my belief that a prolonged inpatient program will enhance her recovery let alone possibly save her life. I encourage the evaluator to call me for additional information regarding her test findings and her drug usage.

I then believe that Kimberly will be amenable to additional testing that may show a change in her cognitive status.

Kimberly Crespi needs inpatient drug counseling and treatment.

Information will be gained during this treatment that may fill in holes in this evaluation. I request authorization to collect information regarding her treatment.


*Michael F. Walczak*

_____
Michael F. Walczak, Psy.D.
DIPLOMATE, FORENSIC NEUROPSYCHOLOGY,
AMERICAN COLLEGE OF FORENSIC EXAMINERS

**EXHIBIT "B"**

# FORENSIC EVALUATION

**NAME:** Crespi, Kimberly    **REG. NO.** 55448-004    **DATE:** July 30, 2002

**REASON FOR IDENTIFICATION AND REFERRAL:** Ms. Kimberly Crespi is a 35-year-old Caucasian female from Florida. Ms. Crespi was arrested, charged, and ultimately indicted on charges of Knowingly and Intentionally Importing Into the United States From a Place Outside Thereof, a Schedule II Substance. This was in violation of Title 21, United States Code, Section 952(a), and Title 18, United States Code, Section 2. Following her arrest, Ms. Crespi underwent psychological and neuropsychological evaluations. She was then determined to be not competent to stand trial by the United States District Court for the Southern District of Florida. Ms. Crespi was committed to the custody of the Attorney General for hospitalization, treatment, and further evaluation of her competency to stand trial in accordance with the provisions of Title 18, United States Code, Section 4241(d).

Upon arrival at this facility, Ms. Crespi was given a confidentiality warning. She was informed of the nature and purpose of this Court Ordered hospitalization. Ms. Crespi initially stated she did not understand the issues involved in her hospitalization. Thus, issues related to competency and her psychological difficulties were discussed with her on several subsequent occasions. Ms. Crespi was soon able to voice an understanding of the nature and purpose of this evaluation, and of the limits of confidentiality. She was informed the information obtained from her during the course of this evaluation would be submitted to the Court in a written report, and Counsel for the government and the defense would receive copies of this report.

**TECHNIQUES UTILIZED:** As part of the evaluation the following documents were reviewed:

1.  A two-page Order regarding competency determination. The Order is dated March 6, 2002, and titled United States of America, Plaintiff, v. Kimberly S. Crespi, Defendant. The Order is signed by the Honorable Wilkie D. Ferguson, United States District Judge.
2.  A one-page Criminal Complaint titled United States of America v. Kimberly S. Crespi, with an attached three-page

FORENSIC EVALUATION
CRESPI, KIMBERLY
REG. NO: 55448-004

PAGE 2

     Affidavit prepared by Edwin Flood, Senior Special Agent,
     United States Customs Service.
3.   A two-count Superceding Indictment titled United States of
     America v. Kimberly S. Crespi, Defendant.
4.   A five-page neuropsychological report regarding Ms. Crespi.
     The report is dated May 15, 2001, and was prepared by
     Michael F. Walczak, Psy.D.
5.   A seven-page Neuropsychological Evaluation regarding
     Ms. Crespi.  The report is dated January 4, 2002, and was
     prepared by Michael F. Walczak, Psy.D.
6.   A three-page Competency Report regarding Ms. Crespi.  The
     report is dated February 19, 2002, and was prepared by
     John A. Spencer, Ph.D.

Ms. Crespi's attorney, Mr. Pat Hunt, and Assistant United States
Attorney, Mr. Jeff Kay, were both contacted by telephone.  Both
attorneys were helpful and cooperative in providing information
regarding Ms. Crespi.  Both Mr. Hunt and Mr. Kay provided the
documents listed above that were utilized as part of this
evaluation.

During the course of her hospitalization and evaluation,
Ms. Crespi has undergone medical evaluation and treatment,
psychiatric evaluation and treatment, and has participated in a
series of clinical interviews.  Ms. Crespi's behavior was
observed by the entire forensic treatment team.  She also was
administered the Kaufman Brief Intelligence Test (K-BIT), the
Wechsler Memory Scales-3 (WMS-3), and the MacArthur Competence
Assessment Tool for Criminal Adjudication (MACCAT-CA).

BACKGROUND INFORMATION: Information regarding Ms. Crespi's
background and history was gathered during a series of clinical
interviews.  In addition, it was noted much of the information
Ms. Crespi has provided was similar to reports she has made to
evaluators during previous mental health examinations.
Ms. Crespi continued to indicate she had some memory lapses for
specific events in her past.  However, she was able to provide
significant historical information.

FORENSIC EVALUATION
CRESPI, KIMBERLY
REG. NO: 55448-004

PAGE 3

Ms. Crespi reports she was born and raised in Florida.  She notes
she was an only child and was raised primarily by her maternal
grandmother.  Ms. Crespi states she cannot recall why her mother
did not raise her, and she acknowledges she had no relationship
with her biological father.  She describes growing up in a middle
class neighborhood, and recalls a pleasant childhood until the
seventh grade.  At that time, Ms. Crespi states she began to
associate with a negative peer group, and she quickly began to
skip school and smoke marijuana on a routine basis.  When asked
about her grandmother's response, Ms. Crespi paused and then
replied "she didn't catch me".  She recalls she had some
behavioral problems and disciplinary difficulties at school.
Ms. Crespi states she did not complete high school, but later
earned a general equivalency diploma, and she attended a
community college and earned an Associates Degree as a Pharmacy
Assistant.

Ms. Crespi states she is a widow, and has had only one marriage
in her life.  She states her husband was killed in an accident,
and this occurred shortly before she was involved in a motor
vehicle accident, which resulted in a head injury.
Ms. Crespi has three children who are now ages 12, 14, and
17 years old.  She states her two younger children are being
cared for by her mother-in-law, and her oldest child is staying
with various relatives and friends.  Ms. Crespi stated her oldest
son went through a significant period of personal turmoil and
difficulty.  She indicates he became involved with drugs, and he
was missing a significant amount of school.  However, she
believes he has now "straightened his life out," and states he
has recently earned good grades and maintained appropriate
conduct.

Ms. Crespi indicates her current difficulties are due to stress
associated with the death of her husband, as well as with the
injuries that occurred when she was involved in the motor vehicle
accident.  She acknowledges she and her husband had occasional
marital difficulties, but notes her husband cared for her and
they were emotionally close.  Ms. Crespi states she was
devastated by the death of her husband.  Apparently, he was
killed when he was hit by a car.  Ms. Crespi and one of the

FORENSIC EVALUATION
CRESPI, KIMBERLY
REG. NO: 55448-004

PAGE 4

children had just dropped him off prior to his accident.
Ms. Crespi did not observe his death, but notes she was having
extensive difficulty with the loss. She recalls approximately
two weeks after her husband's death, she was involved in a
serious automobile accident. Records indicate Ms. Crespi was
injured in this accident, but she did not lose consciousness.
Ms. Crespi has, at various times, reported she has had virtually
no memory of the events that occurred in her life prior to the
automobile accident.

In regard to the instant offense, Ms. Crespi has repeatedly
voiced an awareness of the nature and possible consequences of
the charges against her. However, she also consistently states
she continues to have no direct memory of the events that
occurred in and around the time of her arrest on the current
charges. She reports she has no prior criminal history.

MEDICAL/PSYCHIATRIC HISTORY: Upon arrival at this facility,
Ms. Crespi was given a thorough physical examination. As part of
this evaluation, a medical history was gathered. Ms. Crespi
reported a recent history of seizures following the car accident
that occurred approximately one year ago. She also reports
difficulties with panic attacks and depression. Upon arrival at
this facility, Ms. Crespi was receiving the anti-convulsant
medication Dilantin, in the amount of 400 mg every evening.
Routine physical examination produced no significant results, and
routine laboratory studies were within normal limits. As a
result of her reported history of a head injury and sequella,
including memory loss and seizures, a CT scan of the head was
ordered. The scan was conducted on April 4, 2002. This
diagnostic test revealed no abnormalities of any type. Further
laboratory studies involved x-rays of Ms. Crespi's shoulders, and
the cervical, thoracic, and lumbar areas of the spine. The
x-rays were largely normal, but mild degenerative changes of the
two lower lumbar vertebrae were noted.

Ms. Crespi reports no significant psychiatric history prior to
her automobile accident. Following the accident, she indicates
she had extensive difficulties with depression, and has also

FORENSIC EVALUATION
CRESPI, KIMBERLY
REG. NO: 55448-004

PAGE 5

intermittently reported hearing voices. Her description of these
auditory hallucinations was quite vague. Ms. Crespi also
reported developing panic attacks following the automobile
accident. She could not recall what treatment, if any, she had
received for these symptoms. It is noted that upon arrival at
this facility, Ms. Crespi was only taking anti-convulsant
medications. Ms. Crespi sought psychiatric treatment throughout
her stay at this facility. Treatment was initiated with an
anti-depressant medication, Celexa. Ms. Crespi responded well to
treatment with Celexa, and she also began to receive Remeron, due
to reports of excessive anxiety. Ms. Crespi tolerated these
medications well, and she reports significant relief from her
symptoms of depression and anxiety.

Ms. Crespi has varying reports regarding her substance abuse
history. She routinely acknowledges heavy use of marijuana since
early adolescence. However, at various times she has also
acknowledged she has used opiates and cocaine. She also states
she has used Benzodiazepine and Xanax in the past. When
initially incarcerated in Miami, Florida, Ms. Crespi underwent a
detoxification program for withdrawal from benzodiazepines and
possible withdrawal from opiates.

PSYCHOLOGICAL TESTING: Ms. Crespi has two prior psychological
evaluations. In one evaluation, she was found to be suffering
from numerous cognitive and neuropsychological deficits that were
believed secondary to injuries she received in a car accident.
Psychological testing was conducted within a few weeks of
Ms. Crespi's accident, and at that time, her functioning in most
domains that were assessed was quite poor. For example,
Ms. Crespi was found to have overall intellectual abilities that
placed her in the mild range of mental retardation. In addition,
her ability to perform various memory tasks was extremely
impaired. Ms. Crespi was then ordered to undergo a second
psychological evaluation that occurred in February 2002. In this
evaluation, the examiner concluded Ms. Crespi appeared to be
feigning mental impairment, and this was likely due to possible
secondary gains during interactions with the legal system.

FORENSIC EVALUATION
CRESPI, KIMBERLY
REG. NO: 55448-004

PAGE 6

As a result of the divergent opinions from the two prior
psychological examinations, psychological testing was undertaken.
Ms. Crespi was administered the K-BIT. Her responses to this
standardized test of intelligence place her in the average range
of overall intellectual abilities (K-BIT I.Q. Composite
score = 90). Her vocabulary and verbal abilities placed her in
the average range, and her non verbal abilities placed her near
the higher end of the below average range (vocabulary standard
score = 94, matrices standard score = 88). It is noted that
Ms. Crespi's performance on this standardized intelligence test
is significantly better than the abilities she demonstrated to
Dr. Walczak.

Ms. Crespi was also administered the WMS-3. Her responses to
this widely used, standardized test of various memory functions,
all fell in the average to low average range. Her results are
consistent with intelligence testing conducted at this facility.
In addition, Ms. Crespi's results would indicate she has
sufficient mental capacity to learn, retain, and recall new
information. In fact, Ms. Crespi repeatedly demonstrated an
ability to learn routine and novel sorts of information during
the course of this evaluation. For example, Ms. Crespi had no
difficulties learning, recalling, and using the names of a
variety of staff members who worked with her. In addition, she
was able to find and utilize information that permitted her to
move around this multi-story institution without any apparent
difficulties or impairment. Finally, Ms. Crespi could routinely
recall information that had been provided to her during
interactions with various staff members. In particular, she
could recall information regarding the instant offense, and she
routinely expressed a desire to speak with her defense attorney,
Mr. Hunt.

Ms. Crespi was administered the MACCAT-CA. This instrument
consists of a hypothetical criminal case that is presented to the
examinee. The examinee is then asked to make various decisions
regarding this case and to justify their choices. Ms. Crespi
demonstrated minimal or no impairment in her ability to
understand relevant legal processes and her ability to use
appropriate reasoning in making legal decisions. She did

FORENSIC EVALUATION
CRESPI, KIMBERLY
REG. NO: 55448-004

PAGE 7

demonstrate some mild impairment in her ability to appreciate the
particular circumstances of her legal situation.  Her deficits in
this area include a belief that she is less likely to be treated
fairly by the legal system, but she could not explain the reasons
for this belief.

Ms. Crespi's responses to psychological testing were largely
within normal limits.  Obviously, this represents a significant
change from the apparent malingered responses she provided in one
prior evaluation, and the significantly impaired responses in
another.  The reason for Ms. Crespi's current improvement is not
entirely clear.  As noted in previous evaluations, it appears
likely Ms. Crespi may have exaggerated or feigned the degree of
some of her prior difficulties, and likely has also made some
significant clinical gains during this period of hospitalization.
Regardless of the etiology of these changes, results of
psychological testing indicate Ms. Crespi is clearly competent to
proceed in the pending criminal matter.  She demonstrates an
ability to understand the nature and consequences of the
proceedings against her, and her memory is no longer so impaired
as to prohibit her from assisting her attorney in defending her.
It is noted Ms. Crespi continues to consistently state she has
absolutely no direct memory of her arrest or her conduct in and
around the time of the alleged instant offense.  Despite these
difficulties, Ms. Crespi can review evidence that will likely be
used against her, and she is quite capable of consulting with her
attorney, as well as having discussions with various family
members, friends, and associates who could assist her in
reconstructing the events that occurred in and around the time of
the alleged instant offense.  Finally, it is noted Ms. Crespi has
recently stated on several occasions that she is anxious to
return to Florida and have this matter disposed of in court.

COURSE OF HOSPITALIZATION:  Ms. Crespi arrived at the Federal
Medical Center (FMC), Carswell on March 25, 2002.  She was
admitted to the Mental Health Inpatient Unit where she has
remained for most of this period of her court ordered
hospitalization and treatment.  Ms. Crespi was cooperative and
pleasant during the admission procedures, and she quickly



FORENSIC EVALUATION
CRESPI, KIMBERLY
REG. NO: 55448-004

PAGE 8

adjusted to the routine of the Mental Health Inpatient Unit.
Ms. Crespi earned privileges that permitted her to have a pass to
leave the locked inpatient unit for several hours each day.  She
managed these increased responsibilities without difficulty.  She
was observed to be social with her roommates and other peers on
the unit.  In addition, Ms. Crespi was noted to associate with a
peer group that tended to have frequent disciplinary
difficulties.  On two occasions, Ms. Crespi did receive formal
disciplinary reports.  In the first incident, Ms. Crespi and
several peers were discovered trying to make an alcoholic
beverage.  Incident reports were received by all involved and
Ms. Crespi and the others were ultimately sanctioned by the
Disciplinary Hearing Officer (DHO) to a period of time in
disciplinary segregation.  She completed this time without
difficulty and returned to the Mental Health Inpatient Unit.
Shortly after her return to the inpatient unit, Ms. Crespi
received another incident report in which she was accused of
being insolent and cursing at a staff member.  Ms. Crespi again
returned to the Psychiatric Seclusion Unit while this incident
was investigated.  She appeared before the DHO, and was
ultimately found not guilty of this infraction.  However, during
this period in the Psychiatric Seclusion Unit, Ms. Crespi became
very angry and manipulative.  She threatened to show staff "how
crazy" she could get, and she then threatened suicide.
Ms. Crespi was briefly placed on suicide watch to prevent her
from harming herself, and then she spent a brief period of time
on psychiatric seclusion status with close observations from
staff.  Ms. Crespi did not make any attempts to harm herself, and
stated she simply was angry about receiving another disciplinary
incident report.  Ms. Crespi returned to the Mental Health
Inpatient Unit, where she has spent the last several weeks.
During this time, Ms. Crespi has been accused of some
inappropriate behavior, including being insolent toward staff, as
well as allegations that she was sexually involved with her
roommates.  However, she has received no formal disciplinary
infractions.

In regard to the forensic evaluation, Ms. Crespi was quite
cooperative. She appeared for all scheduled appointments on time,
and she readily completed all tasks that were asked of her.  She



FORENSIC EVALUATION
CRESPI, KIMBERLY
REG. NO: 55448-004

PAGE 9

appeared to put forth her best effort in formal psychological testing, and she was willing to engage in logical and coherent discussions regarding the pending legal charges. Ms. Crespi states she has reviewed her options as a defendant in Federal Court, and her current plan is to seek a plea agreement. As noted previously, Ms. Crespi has continuously and consistently stated she has no memory of the events that occurred in and around the time of her arrest. However, she has been able to review and discuss evidence that could be used against her in Federal Court. Ms. Crespi now voices a clear understanding of the nature and possible consequences of the charges against her. She is able to weigh her options and discuss the advantages and disadvantages of a plea agreement. Finally, Ms. Crespi is fully aware she was arrested at Ft. Lauderdale International Airport, and a drug sniffing dog was involved in her arrest. She states she was taken into custody after the dog identified her as possibly having drugs in her possession. Ms. Crespi is aware she is being accused of bringing cocaine into the United States from Jamaica.

Throughout her hospitalization at this facility, Ms. Crespi continued to receive the anti-convulsant medication, Dilantin, in the amount of 400 mg every day. In addition, Ms. Crespi has been treated for several weeks with the psychiatric medications Celexa and Remeron. Currently, she is receiving 40 mg of Celexa every day, and 30 mg of Remeron every evening. The Celexa is prescribed to assist her with symptoms of depression, and Ms. Crespi reports a positive response to treatment with this medication. The Remeron has been prescribed to assist her with her reported difficulties with anxiety and sleep disturbance. Ms. Crespi only started the Remeron in recent weeks, but she does report an initial positive response to treatment with this medication.

**CURRENT MENTAL STATUS:** Ms. Kimberly Crespi is a fully oriented and alert female who appears approximately her stated age. She typically maintains a neat personal appearance and good hygiene. Ms. Crespi's speech is of normal tone, rate, and volume. Her thoughts are goal-directed and logical. Ms. Crespi does not show

FORENSIC EVALUATION
CRESPI, KIMBERLY
REG. NO: 55448-004

PAGE 10

evidence of difficulties with psychotic symptoms. In the past,
she has reported some difficulties with auditory hallucinations,
but she has not reported any such difficulties in recent weeks.
Ms. Crespi denies thoughts of suicide or self harm. She does
acknowledge some continued difficulties with insomnia, and
occasional problems with anxiety. Ms. Crespi's behavior is
intermittently impulsive, and she has utilized poor judgement on
several occasions during this period of hospitalization.
Ms. Crespi does not appear to be experiencing a formal thought
disorder, and her symptoms of anxiety and depression are well
controlled through the use of appropriate psychiatric
medications. Ms. Crespi is a person of average intellectual
abilities, and despite her complaints of an extremely poor
memory, formal psychological testing indicates Ms. Crespi does
not have significant difficulties with any facet of her memory.

**CASE FORMULATION:** Ms. Kimberly Crespi is a woman who apparently
has a significant history of substance abuse. In August 2000,
Ms. Crespi was arrested and charged with illegally bringing drugs
into the United States. Following her arrest, she was placed on
a period of pre-trial supervised release. While on release, in
March 2001, Ms. Crespi was involved in a serious motor vehicle
accident, and she reportedly experienced a head injury during
this accident. In addition, Ms. Crespi reports her husband of
many years was killed only two weeks prior to the car accident.
Since her accident, Ms. Crespi has reported a number of
psychological and neuropsychological sequella. Her reported
difficulties have included a profound loss of memory for most, if
not all, events that occurred prior to the accident, cognitive
confusion, depression, anxiety, and difficulties with grand mal
seizures. Ms. Crespi has undergone prior psychological
evaluations, which have resulted in conflicting professional
opinions. One opinion is Ms. Crespi's neuropsychological
difficulties were genuine, and a direct result of the injuries
sustained in the car accident. Another opinion was Ms. Crespi
was feigning or exaggerating her psychological and
neuropsychological symptoms as a means of avoiding prosecution
and responsibility for her alleged criminal conduct.

FORENSIC EVALUATION
CRESPI, KIMBERLY
REG. NO: 55448-004

PAGE 11

Ms. Crespi was hospitalized at this facility for approximately
four months. During this period of time, she did not demonstrate
any appreciable difficulties with her memory functioning. When
questioned directly about her memory, Ms. Crespi would routinely
state her memory was very poor, and she particularly emphasized
she had no memory of her arrest for the instant offense.
However, despite these complaints, Ms. Crespi functioned in a
largely normal manner throughout this period of hospitalization.
She was not observed to have any day-to-day difficulties with
memory, orientation, or cognitive confusion. She did report
symptoms of depression and anxiety, and these were treated with
appropriate psychiatric medications with good results. Recently,
Ms. Crespi underwent further psychological testing. Current test
results indicate Ms. Crespi is now functioning in the average
range of overall intellectual abilities, and she has no
appreciable deficits in any aspect of her memory functioning.
Finally, Ms. Crespi demonstrated an ability to understand the
nature and consequences of the pending legal charges, and both an
ability and willingness to work with her defense attorney.
Clearly, Ms. Crespi has now either recovered from symptoms of her
head injury to the extent she is competent to stand trial, or she
has made a volitional choice to cooperate with psychological
testing to the extent she could fully demonstrate her true
abilities. Regardless of the reasons for her improvement,
Ms. Crespi is now competent to stand trial. It is recommended
Ms. Crespi be afforded the opportunity to continue to receive
appropriate psychiatric medications at least until the pending
charges are resolved.

DIAGNOSTIC IMPRESSION: According to the criteria in the
Diagnostic and Statistical Manual of Mental Disorders,
Ms. Crespi's diagnoses are as follows:

|  AXIS I: | 309.28 | Adjustment Disorder With Mixed Anxiety And Depressed Mood |
| | 305.20 R/O* | Cannabis Abuse |
| | 305.60 R/O* | Cocaine Abuse |
| | 305.40 | Sedative, Hypnotic Or Anxiolytic Abuse |

FORENSIC EVALUATION
CRESPI, KIMBERLY
REG. NO: 55448-004

PAGE 12

    AXIS II:  799.9           Diagnoses Deferred On AXIS II

    AXIS III:              Closed Head Injury
*Rule out

**PROGNOSIS:** Ms. Crespi's prognosis is good.  Ms. Crespi has recently demonstrated an improvement in her overall cognitive functioning, and these treatment gains are particularly noteworthy in the area of her memory functions.  It is unlikely Ms. Crespi's reported cognitive or memory difficulties will return, unless she experiences another head injury.  Ms. Crespi does appear to be in need of substance abuse treatment, at least for her acknowledged cannabis abuse.  In addition, Ms. Crespi's symptoms of depression and anxiety are currently well controlled through the use of appropriate psychiatric medications. Ms. Crespi will certainly benefit from ongoing outpatient psychiatric and mental health care.  If such services are provided, Ms. Crespi is unlikely to require a further period of hospital based mental health care.

**OPINION ON COMPETENCY TO STAND TRIAL:** In my professional opinion, Ms. Kimberly Crespi has now recovered from symptoms of a mental disease or defect to the extent she is competent to stand trial. Currently, Ms. Crespi possesses an adequate understanding of the nature and possible consequences of the charges against her, and she gives every indication she is capable of properly assisting in her defense.

Submitted by:                    Reviewed by:

James A. Shadduck, Ph.D.        Robert E. Gregg, Ph.D.
Forensic Psychologist           Chief Psychologist